UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

─────────────────────────────────

JAHRUSALEM HENRY SMITH,[1]

                Plaintiff,

      v.

CAROLYN COLVIN,
COMMISSIONER OF SOCIAL SECURITY,

                Defendant.

─────────────────────────────────

DECISION & ORDER

13-CV-6143P

## PRELIMINARY STATEMENT

       Jahrusalem Henry Smith ("Smith") brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying his application for Supplemental Security Income Benefits ("SSI"). Pursuant to 28 U.S.C. § 636(c), the parties have consented to the disposition of this case by a United States magistrate judge. (Docket # 14).

       Currently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Docket ## 8, 10). For the reasons set forth below, this Court finds that the decision of the Commissioner is supported by substantial evidence in the record and complies with applicable legal standards. Accordingly,

---

[1] Currently pending before the Court is a motion to substitute Jahrusalem Smith as the plaintiff in this action. (Docket # 13). This action was originally commenced by Iacy Brantley on behalf of Jahrusalem Smith. (Docket # 13-1). Smith is over the age of eighteen, and the parties have stipulated to his substitution as plaintiff. (*Id.* at ¶¶ 4-5). Accordingly, the motion to substitute is granted, and the Clerk of the Court is directed to amend the caption accordingly.

the Commissioner's motion for judgment on the pleadings is granted, and Smith's motion for judgment on the pleadings is denied.

## BACKGROUND

### I.  Procedural Background

On November 24, 2009, Smith filed an application for SSI benefits alleging disability due to his Attention Deficit Hyperactivity Disorder ("ADHD"), bipolar disorder, asthma, high lead levels and sleep apnea.  (Tr. 153, 157).[2]  On April 28, 2010, the Social Security Administration denied the application for benefits, finding that Smith was not disabled.[3] (Tr. 70).  Smith requested and was granted a hearing before Administrative Law Judge Brian Kane (the "ALJ").  (Tr. 77-79, 87-90 ).  The ALJ conducted a hearing on May 20, 2011, at which Smith was represented by his attorney, Kelly Laga, Esq.  (Tr. 28-67, 75).  In a decision dated June 24, 2011, the ALJ found that Smith was not disabled and was not entitled to benefits. (Tr. 11-23).

On January 24, 2013, the Appeals Council denied Smith's request for review of the ALJ's decision.  (Tr. 1-4).  Smith commenced this action on March 18, 2013, seeking review of the Commissioner's decision.  (Docket # 1).

### II.  Non-Medical Evidence

#### A.  Application for Benefits

Smith was born on June 30, 1994 and is now twenty years old.  (Tr. 112).  Iacy Brantley ("Brantley"), Smith's grandmother and legal guardian at the time of the application,

---

[2]  The administrative transcript shall be referred to as "Tr. __."

[3]  Smith's previous application for SSI had been denied on August 18, 2009.  (Tr. 68).

reported that Smith has difficulty seeing and hearing.  (Tr. 145).  Brantley also reported that

Smith's daily activities are limited, although she noted that he goes to school full-time and works

part-time during the summers with supervision.  (Tr. 147).  According to Brantley, Smith's

ability to communicate is limited; as examples, she noted that he is unable to deliver phone

messages, repeat stories, tell jokes or riddles accurately, or explain why he did something.  (*Id.*).

Smith reportedly cannot tell time, make correct change when using money, or understand, carry

out and remember simple instructions.  (Tr. 148).  Additionally, Brantley reported that Smith

does not have friends, has difficulty making new friends, does not play team sports and generally

does not get along with adults, school teachers or his siblings.  (Tr. 149).

Brantley reported that Smith has difficulty caring for his personal hygiene,

performing household chores, completing homework or other projects, using public

transportation, accepting criticism, obeying rules and avoiding accidents.  (Tr. 150-51).

According to Brantley, Smith is able to prepare meals, arrive at school on time, take medication,

stay out of trouble and ask for help when needed.  (*Id.*).  According to Brantley, Smith does not

get along well with others, can be combative, tends to isolate himself and has been suspended

from school.  (Tr. 164).  Brantley reported that Smith is frequently disrespectful towards

teachers.  (Tr. 165).

Smith's application indicates that he was employed during the summer of 2009 at

Artpeace, Inc.  (Tr. 186-87).  According to his application, he worked four hours per day, five

days per week making and selling t-shirts.  (*Id.*).

B.      **Academic Evidence (School Records and Teacher Questionnaires)**

1.      **Sixth Grade (2006-2007)**

School records indicate that Smith's sixth grade teacher characterized him as an auditory learner who benefited from having instructions read to him.  (Tr. 124).  According to his teacher, Smith responded well to adults and peers and had many friends, although he needed to develop better strategies for handling his frustration.  (*Id.*).  According to his Individualized Education Program ("IEP") dated June 26, 2007, Smith was classified as having an "Other Health Impairment" and was recommended for resource room services for one hour each day. (Tr. 130-32).  The IEP also provided for Smith to receive accommodations during testing, including extra time, administration of the tests in a small group setting, and reading the tests aloud to him.  (Tr. 133).

According to the IEP, the accommodations were necessary because Smith needed instruction in a smaller environment with a smaller student-to-teacher ratio and minimal distractions.  (*Id.*).  The IEP noted that Smith had been diagnosed with ADHD and bipolar disorder and was extremely distractible.  (*Id.*).  Additionally, Smith had difficulty coping with teacher correction, which frequently caused him to have "extremely explosive" behavioral outbursts.  (*Id.*).  A Wechsler Intelligence Scale for Children IV ("WISC-IV") administered on April 25, 2007, demonstrated that Smith had a full-scale intelligence quotient ("IQ") of 89. (Tr. 134).  The IEP indicated that Smith demonstrated average range in verbal and nonverbal cognitive skills, possessed academic strength in math with age appropriate skills in both calculation and problem solving and had a solid foundation of phonemic skills and sight word recognition.  (Tr. 133).

2.      **Seventh Grade (2007-2008)**

School records indicate that Smith was suspended for several days during seventh grade.  (Tr. 315, 327).  The suspensions related to Smith's difficulties following classroom rules and fighting with another student.  (*Id.*).  Results from a New York State Testing Program ("NYSTP") for both math and language arts indicated that Smith was only partially meeting the learning standards.  (Tr. 316, 320).  Smith received average to below average grades during the school year and failed math, requiring him to attend summer school.  (Tr. 294, 300).

On April 29, 2008, Smith's IEP was reviewed to assess his educational needs for the 2008-2009 academic school year.  (Tr. 307-13).  According to the IEP, Smith demonstrated average range verbal and nonverbal cognitive skills.  (Tr. 309).  The IEP noted that Smith was frequently distracted by his peers, but was quick to comply with redirection in the resource room. (*Id.*).  According to the IEP, Smith's grades were generally good, except math, a class in which he was frequently distracted by his peers.  (Tr. 311).  Although Smith was never disrespectful to adults, he continued to be distracted by his peers.  (*Id.*).  It was determined that Smith continue to be classified as having an "Other Health Impairment" and would continue to receive resource room support and testing accommodations.  (Tr. 309, 312).

3.      **Eighth Grade (2008-2009)**

School records during Smith's eighth grade year indicate that he generally responded well to adults and peers and worked hard in each subject, although he continued to struggle with math and continued to be influenced by his peers.  (Tr. 288).  Smith was suspended for ten days during the school year for incidents relating to verbal or physical altercations with other students.  (Tr. 254-55, 266).

Results from the NYSTP indicated that Smith was meeting the minimum standards for English language arts but was performing under the minimum standards for math. (Tr. 283-86).  Although Smith failed science, he received B's and D's in his other classes during the school year.  (Tr. 249).  Smith was absent approximately seventy-two times from math class, approximately forty-two times from English, approximately thirty-five times from science and approximately twenty-five times from social studies.  (*Id.*).

On April 14, 2009, Smith's IEP was reviewed to assess his educational needs for the 2009-2010 academic school year.  (Tr. 256-62).  According to the IEP, Smith continued to improve in both math and writing skills and demonstrated average verbal and nonverbal cognitive skills.  (Tr. 258).  When focused, Smith completed his assignments and performed well, but continued to be distracted by peers and needed to work redirecting himself to his tasks.  (Tr. 258, 260).  His grades were described as generally good, except for math and science.  (*Id.*).  It was determined that Smith would continue to receive resource room support and testing accommodations.  (*Id.*).

### 4.   Teacher Questionnaires

On June 1, 2011, Smith's global studies teacher, Mrs. Millerthin ("Millerthin"), reported that she had known Smith for two years and that he experienced an unusual degree of absenteeism.  (Tr. 343).  In the domain of Acquiring and Using Information, Millerthin found that Smith had obvious problems understanding school content and vocabulary, reading and comprehending written material, providing organized oral explanations and adequate descriptions, expressing ideas in written form, recalling and applying previously learned material and applying problem-solving skills in class discussions.  (Tr. 344).  In addition, Millerthin found that Smith had slight problems comprehending oral instructions and understanding and

participating in class discussions. (*Id.*). Millerthin noted that Smith had no problems learning new material, but noted that Smith had difficulty concentrating in class. (*Id.*).

In the domain of Attending and Completing Tasks, Millerthin indicated that Smith had very serious problems completing work accurately without careless mistakes, working without distracting himself or others and working at a reasonable pace and finishing on time. (Tr. 345). In addition, Millerthin noted that Smith had serious problems refocusing to task when necessary, changing from one activity to another without being disruptive, organizing his things or school materials, and completing assignments. (*Id.*). In addition, Millerthin indicated that Smith had obvious problems paying attention when spoken to directly, focusing long enough to finish an assigned task, and carrying out multi-step instructions. (*Id.*). Millerthin noted a slight problem in Smith's ability to carry out single-step instructions. (*Id.*). According to Millerthin, Smith had difficulties maintaining focus and was disruptive to other students. (*Id.*). Millerthin did not indicate any other problems in any of the other domains. (Tr. 346-48).

On June 2, 2011, Smith's math teacher completed a questionnaire. (Tr. 334-41). The math teacher noted that Smith had an unusual degree of absenteeism. (Tr. 334). The math teacher did not note any problems in the domain of Acquiring and Using Information. (Tr. 335). In the domain of Attending and Completing Tasks, the math teacher indicated that Smith had an obvious problem organizing his own things and school materials. (Tr. 336). In addition, the teacher indicated that Smith had slight problems paying attention when spoken to directly, focusing long enough to finish an assigned task, refocusing to task when necessary, carrying out multi-step instructions, completing assignments, completing work accurately without careless mistakes, working without distracting others and working at reasonable pace and finishing on time. (*Id.*). The teacher also noted that Smith had no problems carrying out single-step

instructions, waiting to take turns, or changing from one activity to another without being disruptive. (*Id.*). According to the math teacher, although Smith exhibited some problems in this domain, they were not significant enough to "really distract terribly bad." (*Id.*).

According to the math teacher, Smith did not have any serious problems in the domain of Interacting and Relating with Others. (Tr. 337). The teacher indicated that Smith did have obvious problems expressing anger appropriately, using language appropriate to the situation, and listening. (*Id.*). In addition, the teacher noted slight problems playing cooperatively with other children, seeking attention appropriately, following rules, introducing and maintaining relevant and appropriate topics of conversation, and interpreting meaning of facial expression, body language, hints and sarcasm. (*Id.*). According to the teacher, Smith did not have any problems making and keeping friends, asking permission appropriately, respecting and obeying adults in authority, taking turns in conversation or using adequate vocabulary and grammar to express thoughts and ideas in general everyday conversation. (*Id.*). According to the teacher, when Smith got angry, the teacher would let him take a "time out to cool off." (*Id.*). The math teacher indicated that he could almost always understand Smith's speech. (Tr. 338).

In the domain of Moving About and Manipulating Objects, the math teacher observed obvious problems in Smith's ability to move his body from one place to another and slight problems in his ability to move and manipulate things and demonstrate strength, coordination and dexterity in activities or tasks. (*Id.*).

In the domain of Caring for Himself, the math teacher indicated that Smith had obvious problems handling frustration appropriately and responding appropriately to changes in his own mood. (Tr. 339). In addition, the teacher noted that Smith had slight problems being patient, using good judgment regarding personal safety and dangerous circumstances, identifying

and appropriately asserting emotional needs, using appropriate coping skills to meet the demands

of his school environment, and knowing when to ask for help.  (*Id.*).  The teacher also noted that

Smith had no problems taking care of his personal hygiene and caring for his physical needs.

(*Id.*).

One of Smith's teachers, Mary Catherine Bosner, declined to complete a teacher

questionnaire because she did not feel that she knew him well enough as a result of his excessive

absenteeism.  (Tr. 351).


III.     **Relevant Medical Evidence**[4]

A.       **Unity Behavioral Health Records**

Treatment notes indicate that Smith received mental health treatment at Unity

Behavioral Mental Health ("Unity") between 2006 and 2010.  (Tr. 429-75, 503-17, 664-83).

Originally, Smith was seen by James Wallace ("Wallace"), MD, for medication management.

(Tr. 517).  During a visit in May 2006, Smith's grandmother and brother expressed concerns

regarding Smith's "explosive" responses in a variety of settings.  (*Id.*).  Wallace noted that Smith

had been diagnosed with sleep apnea and was taking Risperdal for mental health issues.  (*Id.*).

Wallace considered decreasing the Risperdal dose and adding a mood stabilizer during the

summer months.  (*Id.*).

Smith returned for another appointment with Wallace on January 16, 2007.

(Tr. 512).  During the visit, Smith reported that he was doing "ok" in school and that he was

planning to re-engage in mental health counseling at Unity.  (*Id.*).  Wallace noted that Smith was

taking Depakote and Risperdal, which were controlling his mood.  (*Id.*).  Smith returned for

another appointment with Wallace on August 14, 2007.  (Tr. 503-05).  Smith displayed reactivity

---

[4]  Only those portions of the treatment records that are relevant to this decision are summarized herein.

and oppositional defiance behaviors. (*Id.*). Wallace noted that Smith's family life presented challenges and opined that Smith might suffer from bipolar disorder with oppositional defiant disorder behaviors. (*Id.*). In October 2007, Smith was seen by Wallace who noted that he was doing better in school and was less reactive to triggers. (Tr. 509-10).

Smith returned for an appointment in May 2008 and reported that he was no longer taking his medications. (Tr. 506-08). According to the treatment notes, Smith was struggling in school and exhibiting oppositional defiance with certain teachers, administrators and other children. (*Id.*). Wallace diagnosed Smith with oppositional defiant disorder and some learning difficulties, but did not prescribe medication. (*Id.*).

On September 21, 2009, Smith underwent a psychiatric evaluation by Laura Cardella ("Cardella"), MD. (Tr. 467-75). Cardella diagnosed Smith with oppositional defiant disorder, ADHD and bipolar disorder, rule out. (*Id.*). Cardella assessed a Global Assessment of Functioning ("GAF") of 60. (*Id.*). During the appointment, Smith's grandmother reported that he had ongoing behavior issues involving his temper and inability to focus. (*Id.*). In addition, she reported that his medications had helped to calm him down, but Smith reported that they made him feel sedated. (*Id.*). Cardella noted that Smith presented symptoms of inattention, hyperactivity, impulsivity, mood reactivity and oppositionality. (*Id.*).

Between January 2010 and August 2010, Smith received ongoing mental health treatment at Unity. (Tr. 429-65, 665-83). During that time, Smith routinely attended therapy sessions with Amanda Slater ("Slater"), MS Ed., and received medication management and psychiatric monitoring from Shahida Rehmani ("Rehmani"), MD. (*Id.*). During his treatment, Smith was originally prescribed Focalin, which increased his agitation. (Tr. 442). Rehmani discontinued the Focalin and prescribed Seroquel, which was reportedly effective. (Tr. 442,

448).  Smith continued to experience behavioral issues and problems focusing at school and at home, particularly following his grandmother's rules, such as curfew.  (Tr. 429, 434, 442, 671).

B.    **Strong Hospital Sleep Clinic**

Treatment notes indicate that Smith has received ongoing treatment at Strong Hospital ("Strong") to address his sleep apnea.  (Tr. 365-78, 559-96, 613-63, 684-95).  According to the records, Smith was diagnosed with very mild obstructive sleep apnea in November 2005.  (Tr. 657).  Smith was referred to an otolaryngologist and underwent an adenotonsillectomy.  (Tr. 649).  After the operation, another sleep study was performed in April 2006.  (*Id.*).  According to treatment notes, the sleep study demonstrated no significant obstructive sleep apnea, but did suggest that Smith might suffer from restless leg syndrome.  (Tr. 650).

Smith underwent additional sleep testing in November 2008.  (Tr. 636).  Those tests demonstrated that Smith continued to suffer from very mild obstructive sleep apnea and possibly restless leg syndrome.  (Tr. 631).  Treatment notes indicate that his sleep issues were generally treated by ongoing counseling concerning his sleep hygiene patterns.  (*See*, *e.g.*, 365-78, 559-96, 614-35).  Smith underwent a further sleep study in September 2010.  (Tr. 686).  The results of that study did not demonstrate frequent periodic limb movements and although the polysomnogram was abnormal due to a short sleep latency and a prolonged REM latency, Smith's overall percentages were normal.  (*Id.*).

C.    **Unity Health Medical Records**

Medical records from Unity demonstrate that Smith received treatment from his primary care physician, Vicky Liu ("Liu"), MD, between 2006 and 2011.  (Tr. 476-502, 696-704).  Liu generally monitored Smith's medical concerns, including his sleep issues.

(Tr. 492-502).  Treatment notes indicate that on June 2, 2008, Smith became angry at home and punched his left fist through a house window, causing lacerations to his elbow and hand. (Tr. 489).  Smith's grandmother called the police because Smith was in an "uncontrollable rage" and took him to the emergency room for sutures.  (*Id.*).  On February 20, 2009, Elizabeth Ryan, a nurse practitioner, referred Smith to Unity Outpatient Mental Health indicating that he had lapsed in counseling and desired to restart.  (Tr. 488).

On July 9, 2009, Douglas Liano ("Liano"), MD, provided a letter stating that Smith had recently been seen in the emergency room and diagnosed with asthma and pneumonia. (Tr. 426).  According to Liano, Smith was given medication and was feeling better.  (*Id.*).

On December 1, 2009, Smith and his grandmother attended an office visit with Liu in order to obtain documentation for Smith's SSI application.  (Tr. 484).  Treatment notes indicate that Liu provided a letter and encouraged Smith to continue mental health counseling. (Tr. 485).  The letter stated that Smith had been diagnosed with attention deficit disorder, bipolar disorder and oppositional defiant disorder.  (Tr. 425).  Liu acknowledged that the diagnoses were made by psychiatrists after evaluations and she did not know the onset date of the disorders. (*Id.*).  According to Liu, the disorders continued to affect Smith's schooling and social interactions.  (*Id.*).  Liu also noted that Smith had a history of mildly elevated lead levels.  (*Id.*).

During a well-child care visit on March 14, 2011, Liu noted that Smith attended counseling with Rehmani, but would need a new referral because Rehmani was transferring to Easter Seals.  (Tr. 702).  In addition, Liu also noted that Smith's asthma was under fairly good control, but that he continued to experience chronic sleep problems.  (*Id.*).  Upon examination, Smith appeared to be in good physical condition, with no abnormalities noted by Liu.  (Tr. 703).

Liu prescribed Flovent and Albuteral Sulfate to address Smith's asthma and encouraged him to follow the recommendations provided by the sleep clinic. (*Id.*).

### D.   **Easter Seals Records**

On May 4, 2011, Smith attended an intake appointment with Rehmani at Easter Seals. (Tr. 705-09). Treatment notes indicate that Smith had been diagnosed with ADHD, oppositional defiant disorder, rule out bipolar disorder, and that Smith had difficulty listening to authority, angered easily and once pulled a knife on his brother. (*Id.*). At the time of the appointment, Smith had not been taking Seroquel for the past three months and reported mood and anger issues during that time period. (*Id.*). Smith reported occasional marijuana use. (*Id.*).

Rehmani noted that Smith was pleasant and well-engaged during the appointment and displayed logical and goal-directed thought processes. (*Id.*). Rehmani diagnosed Smith with ADHD by history, oppositional defiant disorder and parent child conflict and assessed a GAF of 65. (*Id.*). Rehmani prescribed Seroquel and recommended behavior modification and parent training. (*Id.*).

On May 16, 2011, Rehmani completed a medical source statement for Smith regarding bipolar disorder. (Tr. 710-12). According to Rehmani, Smith demonstrated an irritable mood, difficulty thinking or concentrating, increased talkativeness or pressure of speech and was easily distractible. (*Id.*). Rehmani opined that Smith was moderately limited in the domains of Acquiring and Using Information, Attending and Completing Tasks, and Interacting and Relating with Others. (*Id.*). Rehmani also opined that Smith was mildly impaired in social functioning and suffered from mild impairments in his ability to maintain concentration, persistence or pace, resulting in frequent failures to complete tasks in a timely manner. (*Id.*).

According to Rehmani, Smith had no impairments in personal functioning, including caring for himself and his personal hygiene.  (*Id.*).

### E.      School Psychologist Evaluations

On April 25, 2007, Michele McCortney ("McCortney"), NCSP, a certified school psychologist, performed a psychological evaluation of Smith.  (Tr. 357-63).  At the time of the evaluation, Smith had been referred to the Committee on Special Education ("CSE") at the request of his grandmother to determine whether his diagnosed mental impairments affected his academic performance.  (*Id.*).

McCortney noted that Smith was currently attending the sixth grade in a general education classroom.  (*Id.*).  McCortney noted that Smith had been diagnosed with bipolar disorder and ADHD and was currently taking Risperdal and Depakote.  (*Id.*).  Smith's grandmother had reported concerns regarding his uncontrollable rage.  (*Id.*).  According to McCortney, Smith had begun receiving special education services as a preschool student and was classified as a student with a speech or language impairment in kindergarten.  (*Id.*).  He was placed in the general education program, but received speech therapy.  (*Id.*).  Eventually, he was determined to no longer qualify for special education services, although he repeated the second grade.  (*Id.*).  He was referred to the CSE in fourth grade, but he was determined not to qualify for special education services because his cognitive and academic scores were within the low average to average ranges.  (*Id.*).  Smith's sixth grade teacher described him as "hard-working, polite and well behaved," although she noted that he did require refocusing and redirection.  (*Id.*).

Smith was assessed to read at a late-second grade level.  (*Id.*).  McCortney reported that Smith had an IQ of 89, which fell within the low average to average range.  (*Id.*).

Smith's scores for verbal comprehension, perceptual reasoning, and processing speed were within the average range.  (*Id.*).  Smith scored in the low average range on the working memory index.  (*Id.*).  According to McCortney, Smith's cognitive profile suggests that he is able to process information presented in both auditory and visual formats in an age-appropriate manner.  (*Id.*).  McCortney noted that Smith struggled with distractibility and was easily drawn off-task.  (*Id.*).

McCortney also administered the Woodcock Johnson III Test of Achievement to measure Smith's academic achievements.  (*Id.*).  Smith demonstrated well-developed sound and symbol awareness skills.  (*Id.*).  Smith's decoding skill level was equivalent to the fourth grade level, his fluency was equivalent to a fifth grade level and his comprehension was equivalent to a 3.7 grade level.  (*Id.*).  Smith demonstrated grade appropriate skills in math, and his writing skills were equivalent to an early fourth grade level.  (*Id.*).  McCortney noted that Smith did not respond well to criticism, and that school reports indicated that he had two to three episodes of explosive rage and that his grandmother had reported more frequent outbursts at home, including physical altercations and an incident of setting a fire.  (*Id.*).  At the time of the evaluation, Smith was on long-term suspension because he had destroyed school property and had attempted to assault an adult.  (*Id.*).  McCortney recommended that Smith be classified as "Other Health Impaired" and that he be provided resource room support.  (*Id.*).

On March 17, 2010, Rhonda Korn ("Korn"), a certified school psychologist, issued a report of her psychological evaluation.  (Tr. 208-10).  Korn noted that Smith was currently enrolled in the ninth grade in a general education classroom setting.  (*Id.*).  According to Korn, Smith learned best in a quiet, structured environment with organizational help and seat changes to help with distractions.  (*Id.*).  Korn noted that Smith participated in class, but seldom

completed homework.  (*Id.*).  Although Smith generally performed well on examinations, his grades were low due to absences and tardiness.  (*Id.*).  According to Korn, Smith was not currently taking prescribed medication to treat his ADHD or bipolar disorder.  (*Id.*).

Korn administered the Woodcock-Johnson Tests of Achievement to measure Smith's academic achievements.  (*Id.*).  According to Korn, Smith demonstrated average achievement in math fluency and applications and low average achievement in math calculations with overall math skills measured in the sixth to seventh grade level.  (*Id.*).  With respect to reading, Smith was in the low average range for comprehension and borderline range for fluency.  (*Id.*).  Korn opined that Smith did not demonstrate significant progress in academic achievement skills, which was a reflection of his effort, poor attention span, and poor attendance.  (*Id.*).

Smith's teacher reported that he was disruptive in class, easily distracted and off-task, and was failing most of his classes.  (*Id.*).  Korn opined that Smith had average cognitive ability, but was performing below grade level in all of his classes.  (*Id.*).  Korn recommended that Smith continue to be classified as "Other Health Impairment" and receive integrated special class teacher services and testing modifications.  (*Id.*).

On March 16, 2010, Smith was evaluated by Thomas Soule ("Soule"), a certified school social worker.  (Tr. 211-15).  After reviewing Smith's social and family history, Soule determined that counseling was not recommended because Smith's behavior and emotional stability did not significantly affect his performance.  (*Id.*).  Soule recommended that Smith continue with mental health services and other community supports.  (*Id.*).

F.     **Christine Ransom, PhD**

On July 2, 2009, state examiner Christine Ransom ("Ransom"), PhD, conducted a psychiatric evaluation of Smith.  (Tr. 409-12).  Smith was accompanied by his grandmother.

(*Id.*).  Smith reported that he would be in the ninth grade the following school year and that he received counseling and special education services at school.  (*Id.*).  Ransom noted that Smith had been receiving outpatient mental health treatment at Unity since he was six years old.  (*Id.*).  His grandmother reported that his prescriptions had been recently discontinued because of side effects and that Smith continues to have episodes of explosive rage.  (*Id.*).  Smith reported that he maintained his own personal hygiene and enjoyed spending time with his friends.  (*Id.*).

Upon examination, Ransom noted that Smith appeared neatly dressed with adequate grooming and hygiene.  (*Id.*).  Ransom opined that Smith had slow and halting speech with adequate language, coherent and goal-directed thought processes, moderately dysphoric and withdrawn affect and mood, clear sensorium, full orientation, good insight, good judgment and borderline intellectual functioning with a somewhat limited general fund of information.  (*Id.*).  Ransom noted that Smith's attention and concentration were mildly impaired.  (*Id.*).  According to Ransom, Smith could count backwards and perform two out of three simple calculations, but needed redirection throughout the examination because his attention and concentration were apparently impaired by limited intellectual capacity and emotional disturbance.  (*Id.*).  Ransom found Smith's immediate memory moderately impaired.  (*Id.*).  According to Ransom, Smith could recall one out of three objects immediately, one out of three objects after five minutes and could complete three digits forward and three digits backward.  (*Id.*).  Ransom also opined that Smith's memory functions appeared impaired by limited intellectual capacity and emotional disturbance.  (*Id.*).

According to Ransom, Smith had moderate difficulties attending to, following and understanding age-appropriate directions, completing age appropriate tasks, adequately maintaining appropriate social behavior, responding appropriately to changes in the environment,

learning in accordance with cognitive functioning, asking questions and requesting assistance in an age-appropriate manner, being aware of danger and taking needed precautions, and interacting adequately with peers and adults. (*Id.*). According to Ransom, Smith suffered from bipolar disorder, currently moderate, and probable borderline intellectual capacity. (*Id.*).

**G.     George Alexis Sirotenko, DO**

On July 2, 2009, George Alexis Sirotenko ("Sirotenko"), DO, conducted a pediatric examination of Smith. (Tr. 413-18). Sirotenko opined that Smith did not suffer from any physical limitations, but noted that Smith had a history of asthma. (*Id.*). Sirotenko opined that Smith should avoid respiratory triggers and continue monitoring his sleep apnea. (*Id.*).

**H.     E. Kamin, Psychology**

On August 5, 2009, agency medical consultant Dr. E. Kamin ("Kamin")[5] completed a Childhood Disability Evaluation. (Tr. 419-24). Kamin concluded that Smith suffered from a severe impairment or combination of impairments, but opined that his impairments did not meet or equal a listed impairment. (*Id.*). Kamin opined that Smith suffered from marked limitation in his ability to interact and relate with others. (*Id.*). In addition, Kamin opined that Smith suffered from less than marked limitations in his health and physical well-being and in his ability to acquire and use information and attend and complete tasks. (*Id.*). Kamin assessed that Smith did not suffer from any limitations in his ability to move about and manipulate objects and care for himself. (*Id.*).

**I.     A. Hochberg, Psychology**

On April 27, 2010, agency medical consultant Dr. A. Hochberg ("Hochberg") completed a Childhood Disability Evaluation. (Tr. 597-602). Hochberg concluded that Smith

---

[5] Kamin was the agency consultant with the overall responsibility for the assessment, although, R. Baum, a pediatrician, was also consulted in formulating the assessment. (Tr. 420).

suffered from a severe impairment or combination of impairments, but opined that his

impairments did not meet or equal a listed impairment.  (*Id.*).  Hochberg opined that Smith

suffered from less than marked limitations in his health and physical well-being and in his ability

to acquire and use information, attend and complete tasks and to interact and relate with others.

(*Id.*).  Hochberg assessed that Smith did not suffer from any limitations his ability to move about

and manipulate objects and care for himself.  (*Id.*).


## IV.   **Proceedings before the ALJ**

At the administrative hearing, Smith testified that he continues to experience

difficulty sleeping.  (Tr. 36).  According to Smith, he has a sleep plan that he follows to assist his

sleep, including the use of a sound machine.  (Tr. 37-38).  Smith testified that he typically

awakens twice at night for approximately five minutes before falling back asleep.  (Tr. 39).

According to Smith, he is often drowsy during the day and naps on the bus or in classes.

(Tr. 36-39).

Smith testified that his grades at school had improved, although they were still

"not great."  (Tr. 40).  Smith attributed his improved grades to the motivation that he received

from his mentor, who checks his homework.  (Tr. 44).  According to Smith, his mentor was

encouraging him to try to get a scholarship to go to college.  (Tr. 52).  Smith testified that his

mentor had helped him obtain summer employment making t-shirts.  (Tr. 41).

According to Smith, he used to benefit from the services he received in the

resource room at school, but he no longer receives those services.  (Tr. 41-42).  Smith testified

that he is currently placed in a classroom setting with approximately ten students and three to

four teachers.  (Tr. 42).  According to Smith, one of the teachers assists him throughout his

classes by breaking down the other teacher's instructions so that he can understand them. (Tr. 43).  Smith testified that he likes integrated algebra, science and chemistry, but continues to struggle in English.  (*Id.*).  According to Smith, he gets along with his teachers, with the exception of his English teacher.  (Tr. 50).  Smith testified that he cannot read fluently, although he is able to read a newspaper.  (Tr. 43-44).

Smith testified that he was suspended several times for fighting with other students.  (Tr. 45).  According to Smith, he fought with his classmates to try to stop them from bullying him.  (*Id.*).  Smith now generally gets along with everyone at school, has a best friend and enjoys playing basketball with his friends.  (*Id.*).  Smith used to play for the school basketball team, but did not return to the team this year because he did not get along with a teammate.  (Tr. 52-53).

Smith testified that he takes Albuterol, Seroquel and vitamins.  (Tr. 45).  According to Smith, the Seroquel calms him down and he has difficulty in school if he does not take it.  (Tr. 46-47).  Smith testified that he continues to work on ways to control his anger at school, including asking for a bathroom pass to walk around and calm down.  (Tr. 47, 49-50).  According to Smith, he began taking Seroquel this year and he has not had as many difficulties in school.  (Tr. 50).

At home, Smith sometimes fights with his brothers and sometimes avoids his chores, which causes his grandmother frustration.  (Tr. 50-51).  After she gets frustrated, he will complete his chores.  (*Id.*).

Smith's grandmother testified that she noticed when he was very young that he might suffer from mental health issues and she attended many different programs to help Smith and his brothers.  (Tr. 54-57).  According to Smith's grandmother, she sometimes has to tell him

things repeatedly, which causes frustration.  (Tr. 58).  She testified that Smith's medication does appear to work and that she was not aware of "so much" trouble at school during the current school year.  (Tr. 61-63).  According to Smith's grandmother, Smith exhibits anger in an explosive manner, although she had not witnessed an explosive episode in a long time.  (Tr. 62).  She also testified that Smith is frequently tired during the day.  (*Id.*).


## DISCUSSION

### I.      Standard of Review

This Court's scope of review is limited to whether the Commissioner's determination is supported by substantial evidence in the record and whether the Commissioner applied the correct legal standards.  *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004) ("[i]n reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision"), *reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005); *see also Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) ("it is not our function to determine *de novo* whether Smith is disabled[;] . . . [r]ather, we must determine whether the Commissioner's conclusions are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard") (internal citation and quotation omitted).  Pursuant to 42 U.S.C. § 405(g), a district court reviewing the Commissioner's determination to deny disability benefits is directed to accept the Commissioner's findings of fact unless they are not supported by "substantial evidence."  *See* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive").  Substantial evidence is defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted).

To determine whether substantial evidence exists in the record, the court must consider the record as a whole, examining the evidence submitted by both sides, "because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). To the extent they are supported by substantial evidence, the Commissioner's findings of fact must be sustained "even where substantial evidence may support the claimant's position and despite the fact that the [c]ourt, had it heard the evidence *de novo*, might have found otherwise." *Matejka v. Barnhart*, 386 F. Supp. 2d 198, 204 (W.D.N.Y. 2005) (citing *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983)).

A child is disabled for the purposes of SSI if they have "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). When assessing whether a claimant is disabled, the ALJ must employ a three-step sequential analysis. *See Miller v. Comm'r of Soc. Sec.*, 409 F. App'x 384, 386 (2d Cir. 2010). The three steps are:

(1)   whether the child is engaged in substantial gainful activity;

(2)   whether the child has a medically determinable impairment that is severe such that it causes more than minimal functional limitations; and

(3)   whether the child's impairments medically equal or functionally equal a presumptively disabling condition listed in Appendix 1 of Subpart P of Part 404 of the relevant regulations.

*See id.* (citing 20 C.F.R. § 416.924(b)-(d)).

When determining whether a child's impairment functionally equals a listed impairment, the ALJ must evaluate the child's functioning across the following six domains of functioning:

(1)  acquiring and using information;

(2)  attending and completing tasks;

(3)  interacting and relating with others;

(4)  moving about and manipulating objects;

(5)  caring for oneself; and

(6)  health and physical well-being.

*See id.* (citing 20 C.F.R. § 416.926a(a)).  To be functionally equivalent, the impairment must result in a finding of "extreme" functional limitations in at least one domain or a finding of "marked" functional limitations in at least two domains.  *See id.*

A "marked" limitation is one that is "more than moderate but less than extreme" and that "interferes seriously with [a child's] ability to independently initiate, sustain or complete activities."  20 C.F.R. § 416.926a(e)(2)(i); *see also Spruill ex rel. J.T. v. Astrue*, 2013 WL 885739, *5 (W.D.N.Y. 2013) ("[a] marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with [the child's] ability to function independently, appropriately, effectively, and on a sustained basis") (quoting 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C)).  Generally, a "marked" limitation is the equivalent of functioning resulting in scores on standardized tests that are "at least two, but less than three, standard deviations below the mean."  20 C.F.R. § 416.926a(e)(2)(i).  An "extreme" limitation is one which "interferes very seriously

with [a child's] ability to independently initiate, sustain or complete activities."  20 C.F.R.

§ 416.926a(e)(3)(i).

In his decision, the ALJ followed the required three-step analysis for evaluating

childhood disability claims.  (Tr. 11-24).  Under step one of the process, the ALJ found that

Smith had not engaged in substantial gainful activity since November 24, 2009, the application

date.  (Tr. 14).  At step two, the ALJ concluded that Smith has the severe impairments of sleep

apnea, attention deficit hyperactive disorder and oppositional defiant disorder.  (*Id.*).  At step

three, the ALJ determined that Smith does not have an impairment (or combination of

impairments) that meets or medically equals one of the listed impairments.  (*Id.*).  In addition, the

ALJ concluded that Smith did not have an impairment (or combination of impairments) that

functionally equaled one of the listed impairments.  (Tr. 14-23).  In reaching this conclusion, the

ALJ evaluated Smith's impairments across the six domains of functioning.  Specifically, the ALJ

concluded that Smith suffered from less than marked limitations in the domains of acquiring and

using information, attending and completing tasks, interacting and relating with others, and

health and physical well-being.  (*Id.*).  In addition, the ALJ concluded that Smith had no

limitations in the domains of moving about and manipulating objects, and caring for himself.

(*Id.*).  Accordingly, the ALJ found that Smith is not disabled.  (*Id.*).

## II.  <u>Analysis</u>

In his motion, Smith contends that the ALJ erred when he determined that Smith

does not suffer from an impairment or combination of impairments that functionally equals a

listed impairment.  (Docket # 10-1).  Specifically, Smith contends that the ALJ erred when he

found that Smith has "less than marked" limitations in the domains of interacting and relating

with others and attending and competing tasks.  (*Id.* at 10-15).  According to Smith, the ALJ did

not properly acknowledge information contained in the record, including treatment notes,

testimony, medical opinions and teacher questionnaires, all of which suggested that Smith had

limitations in these domains.  (*Id.* at 11-15).  Because Smith challenges only the ALJ's findings

as to interacting and relating with others and attending and completing tasks, the Court's analysis

addresses these domains of functioning.

### A.  <u>Interacting and Relating with Others</u>

In evaluating the level of impairment in the domain of interacting and relating

with others, consideration must be given to "how well the child initiates and sustains emotional

connections with others, develops and uses the language of [his] community, cooperates with

others, complies with the rules, responds to criticism, and respects and takes care of the

possessions of others."  *Dayton v. Astrue*, 2012 WL 4711988, *5 (N.D.N.Y. 2012) (citing 20

C.F.R. § 416.926a(i)).  The regulations provide that adolescents between ages twelve and

eighteen should be able to initiate and develop friendship with their peers and relate

appropriately to other children and adults.  20 C.F.R. § 416.926a(i)(2)(v).  They should also be

able to solve conflicts between themselves and others and recognize that there are different social

rules for themselves and peers and adults.  *Id.*  They should also be able to intelligibly express

their feelings, ask for assistance, seek information, describe events, and tell stories in different

environments and to different people.  *Id.*

When evaluating a child's level of impairment, the ALJ should "consider all

relevant evidence in determining a child's functioning," including information from the child's

teachers or from therapists.  *Swan v. Astrue*, 2010 WL 3211049, *6 (W.D.N.Y. 2010); *Yensick v.*

*Barnhart*, 245 F. App'x 176, 181 (3d Cir. 2007) ("[t]he ALJ may also consider other opinions

about a claimant's disability from persons who are not deemed 'acceptable medical sources,' such as a therapist who is not a licensed or certified psychologist"). Evidence from teachers or therapists "cannot establish the existence of a medically determinable impairment," but their opinions may be used "to show the severity of the individual's impairment(s) and how it affects the individual's ability to function." *See* Social Security Ruling 06-03P, 2006 WL 2329939, *2 (2006).

Social Security Ruling 06-03P recognizes that "[n]on-medical sources who have had contact with the individual in their professional capacity, such as teachers . . . who are not health care providers, are also valuable sources of evidence for assessing impairment severity and functioning[;] [o]ften, these sources have close contact with the individuals and have personal knowledge and expertise to make judgments about their impairment(s), activities, and level of functioning over a period of time." *Id*. In evaluating evidence supplied by sources such as teachers or therapists, the ALJ should consider:

  (1) how long the source has known and how frequently the source has seen the individual;

  (2) how consistent the opinion is with other evidence;

  (3) the degree to which the source presents relevant evidence to support an opinion;

  (4) how well the source explains the opinion;

  (5) whether the source has a specialty or area of expertise related to the individual's impairment(s); and

  (6) any other factors that tend to support or refute the opinion.

*Id.* at *4-5.

Smith maintains that the ALJ failed to evaluate information contained in the record in reaching his determination that Smith suffered from less than marked limitations in the

domain of interacting and relating with others.  Specifically, Smith contends that the ALJ failed

to consider information contained in Slater's treatment notes, the opinion of Kamin and Baum

that Smith suffered from marked limitations in this domain, Ransom's opinion that Smith would

suffer from moderate limitations interacting with peers and adults, Smith's testimony that he had

been suspended and had difficulty interacting with others, his grandmother's testimony that he

had difficulties interacting with others, and his math teacher's opinion that he had obvious

problems in this domain.  (Docket ## 10-1 at 11-12, 16 at 3-4).

   I conclude that the ALJ properly considered the information provided by Slater,

Ransom, Smith, and Smith's grandmother and math teacher in reaching his determination that

Smith suffered from less than marked limitations in the domain of acquiring and using

information.  In his decision, the ALJ recounted at length and discussed information from a

variety of sources, including Smith's and his grandmother's testimony; Smith's medical records;

Smith's educational records, including information contained in the IEP's, the teacher

questionnaires, report cards and the results of a psychological examination conducted by Korn;

the results of consultative examinations conducted by Ransom and Sirotenko; and treatment

notes from Smith's mental health providers, which included a medical source statement

submitted by Rehmani, Smith's treating psychiatrist.

   Specifically, the ALJ described the treatment provided by Slater at Unity and

noted that the treatment records suggested that Smith "finds it difficult to control his anger and

he becomes violent directed to objects and people." (Tr. 17).  The ALJ noted, however, that

Smith had made good progress, had developed coping skills and that his behavioral problems

had improved.  (*Id.*).  The ALJ discussed Ransom's opinion at length and noted the moderate

limitations assessed by Ransom.  (*Id.*).  Additionally, the ALJ noted the math teacher's

observations that Smith had problems in the domain of interacting and relating with others.

(Tr. 16-17).  Finally, the ALJ acknowledged the testimony provided by both Smith and his

grandmother, including testimony that Smith "tends to engage in destructive behaviors" when he

becomes very angry.  (Tr. 15).  The ALJ also noted, however, that both Smith and his

grandmother testified that he was doing better and that his medication regimen had positively

affected his behavioral problems.  (*Id.*).  I agree with Smith that the ALJ failed to discuss the

report submitted by Kamin and Baum, the non-examining state consultants.  However, I do not

find that this failure warrants remand because, as discussed below, the ALJ's determination is

otherwise supported by substantial evidence.  *See Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d

Cir. 1983) ("[w]hen . . . the evidence of record permits us to glean the rationale of an ALJ's

decision, we do not require that he have mentioned every item of testimony presented to him or

have explained why he considered particular evidence unpersuasive or insufficient to lead him to

a conclusion of disability").

In addition to considering the information discussed above, the ALJ also

considered and gave great weight to the opinion provided by Rehmani, Smith's treating

psychiatrist.  (Tr. 17).  According to Rehmani, Smith was only moderately limited in the domain

of interacting and relating with others.  (*Id.*).  This opinion was echoed by Ransom, the state

examining psychiatrist, who also assessed moderate limitations, and whose opinion the ALJ

accorded "great weight."  (Tr. 18).  After considering the evidence described above, the ALJ

recognized that Smith has limitations in the domain of acquiring and using information, but

agreed with Dr. Rehmani that such limitations were "less than marked."

In reaching this determination, the ALJ specifically acknowledged the assessment

provided by Smith's math teacher.  That opinion, while identifying that Smith had some

limitations in the domain of interacting and relating with others, was not necessarily inconsistent

with the ALJ's conclusion that those limitations were "less than marked." *See Abukhader ex rel.*

*I.K.A. v. Comm'r of Soc. Sec.*, 2013 WL 5882858, *2, 6 (S.D.N.Y. 2013) (ALJ's determination

of less than marked limitation in domain of acquiring and using information was based upon

substantial evidence where teacher questionnaire indicated that plaintiff had problems ranging

from "slight" to "very serious" in the activities associated with the domain); *Petrie ex rel. T.T. v.*

*Colvin*, 2013 WL 1500360, *6 (N.D.N.Y. 2013) (ALJ properly concluded plaintiff suffered from

less than marked limitations in domain of acquiring and using information where teacher

questionnaire indicated that plaintiff suffered from "slight" to "very serious" problems

performing activities associated with domain).  In any event, the ALJ properly supported his

finding by reference to the opinions of both Ransom and Rehmani that Smith did not suffer from

"marked" limitations in this domain.  *See Williams ex rel. TLW v. Colvin*, 2014 WL 1338561, *5

(W.D.N.Y. 2014) (ALJ's determination was supported by substantial evidence despite teacher

identifying a range of limitations from "slight" to "serious" in domain of acquiring and using

information; "the ALJ's finding was supported by opinions of [non-examining doctors;] . . . the

opinion of a non-examining source, such as a state agency physician, can constitute substantial

evidence in support of an ALJ's determination where . . . it is consistent with the record as a

whole").  Although the ALJ could have explained more fully his evaluation of Kamin's opinion

and the math teacher's opinion, his decision as a whole shows that he considered the relevant

evidence, and substantial evidence supports his conclusion that Smith's limitations were less

than marked.  *See Johnson ex rel. A.J. v. Astrue*, 2013 WL 1187436, *14 (S.D.N.Y. 2013) ("[i]f,

as here, the ALJ's decision was based on substantial evidence, and correct legal principles were

applied, this [c]ourt must affirm the Commissioner's final decision even if the record contains

contrary evidence"); *Frye ex rel. A.O. v. Comm'r of Soc. Sec.*, 2010 WL 6426346, *9 (N.D.N.Y.

2010) ("[t]he ALJ could have more clearly explained how he reconciled the seemingly mixed

evidence regarding the extent of claimant's limitations in this domain[;] [h]owever, he properly

referenced the evidence on both sides of the issue and marshaled substantial evidence supporting

his conclusion that [the child's] limitations were less than marked").

### B.  <u>Attending and Completing Tasks</u>

In evaluating the level of impairment in the domain of attending and completing

tasks, consideration must be given to how well a child is able to focus and maintain his attention,

and how well he begins, carries through, and finishes his activities, including the pace at which

he performs activities.  20 C.F.R. § 416.926a(h).  The regulations provide that adolescents

between ages twelve and eighteen should be able to pay attention for longer presentations and

discussions and maintain their concentration while reading text books.  20 C.F.R.

§ 416.926a(h)(2)(v).  In addition, they should be able to independently plan and complete

long-range academic projects and should be able to organize their materials and plan their time

in order to complete school tasks and assignments.  *Id.*  They should also be able to maintain

attention on a task for extended periods of time and not be unduly distracting to or distracted by

their peers in a school or work setting.  *Id.*  The ALJ should "consider all relevant evidence in

determining a child's functioning," including information from the child's teachers or from

therapists.  *Swan v. Astrue*, 2010 WL 3211049 at *6; *Yensick v. Barnhart*, 245 F. App'x at 181

("[t]he ALJ may also consider other opinions about a claimant's disability from persons who are

not deemed 'acceptable medical sources,' such as a therapist who is not a licensed or certified

psychologist").

In essence, Smith challenges the ALJ's conclusions with respect to this domain on the same basis as he challenged his findings concerning the domain of interacting and relating with others.  Smith acknowledges that the ALJ recognized that Smith's teachers opined that he suffered from some problems within this domain, but maintains that the ALJ failed to provide a rationale for concluding that Smith suffered from less than marked limitations in this domain. (Docket # 10-1 at 14-15).  In addition, Smith argues that the ALJ failed to consider Korn's recommendations.  (Docket # 16 at 5).  Finally, Smith contends that ALJ improperly considered Rehmani as a treating physician when Rehmani had treated Smith only once.  (Docket # 10-1 at 15).

Contrary to Smith's contention, the ALJ adequately discussed the teacher evaluations and Korn's opinion and, although he could have more fully articulated his analysis, his decision as a whole reflects that he considered the relevant evidence, and substantial evidence supports his conclusion that Smith's limitations were less than marked.  *See Johnson ex rel. A.J. v. Astrue*, 2013 WL 1187436 at *14 ("[i]f, as here, the ALJ's decision was based upon substantial evidence, and correct legal principles were applied, this [c]ourt must affirm the Commissioner's final decision even if the record contains contrary evidence"); *Frye ex rel. A.O. v. Comm'r of Soc. Sec.*, 2010 WL 6426346 at *9 ("[t]he ALJ could have more clearly explained how he reconciled the seemingly mixed evidence regarding the extent of claimant's limitations in this domain[;] [h]owever, he properly referenced the evidence on both sides of the issue and marshaled substantial evidence supporting his conclusion that [the child's] limitations were less than marked").  Although his global studies teacher assessed that Smith suffered from several "very serious" to "serious" limitations in this domain, that assessment is not necessarily inconsistent with the ALJ's conclusion that Smith suffered from less than marked limitations in

this domain.  *See Abukhader ex rel. I.K.A. v. Comm'r of Soc. Sec.*, 2013 WL 5882858 at *2, 6

(ALJ's determination of less than marked limitation in domain of acquiring and using

information was based upon substantial evidence where teacher questionnaire indicated that

plaintiff had problems ranging from "slight" to "very serious" in the activities associated with the

domain); *Petrie ex rel. T.T. v. Colvin*, 2013 WL 1500360 at *6 (ALJ properly concluded plaintiff

suffered from less than marked limitations in domain of acquiring and using information where

teacher questionnaire indicated that plaintiff suffered from "slight" to "very serious" problems

performing activities associated with domain).  This is particularly true where another teacher

(Smith's math teacher) assessed that his limitations in this domain ranged between "no problem"

to an "obvious problem" and noted that although Smith demonstrated some problems in this

domain, they were "not enough to really distract terribly bad."  (Tr. 336).  Further, the ALJ

supported his decision by reliance upon the opinions of Ransom and Rehmani, who both

assessed moderate, at most, limitations in the activities associated with this domain.  (Tr. 411,

711).

Smith's argument that Rehmani did not qualify as a treating physician is belied by

the record.  Rehmani was Smith's treating psychiatrist during his mental health treatment at

Unity in 2010 and continued in that capacity after Rehmani left Unity and transferred to Easter

Seals in 2011.  (Tr. 48-49, 441-46, 705-09).  Accordingly, I conclude that the ALJ properly

accorded great weight to Rehmani's opinion as a treating physician.

C.   **Arguments Raised in Smith's Response Papers**

Smith argues, for the first time, in his reply papers that the ALJ erred because he

failed to indicate the weight he afforded to the opinions of Smith's teachers and Korn's

evaluation.  (Docket # 16 at 3 n.1, 5 n.3, 6 n.4).  Smith also argues for the first time that the ALJ

32

erred because he failed to explicitly assess the credibility of Smith and his grandmother.  As an initial matter, these arguments appear procedurally barred because Smith failed to raise them in his opening brief.  *See Jones v. Astrue*, 2013 WL 802778, *5 (E.D.N.Y. 2013) (claimant's argument procedurally deficient when not raised in its opening brief) (collecting cases).  In any event, I conclude that these alleged errors do not warrant remand.  Although Smith is correct that the ALJ should have indicated the weight that he assigned to Korn and his teachers, *see Curtis ex rel. B.C. v. Colvin*, 2013 WL 3327957, *5 (N.D.N.Y. 2013) ("an ALJ should explain the weight assigned to opinions from other sources or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the ALJ's reasoning") (internal quotations and brackets omitted), I conclude that the failure to assign a specific weight does not warrant remand because the ALJ discussed at length the opinions in his decision and "despite the lack of specific weight assigned to the opinions, the court is able to discern with ease the ALJ's reasoning" *see id.*

I likewise agree with Smith that the ALJ should have made explicit findings as to the credibility of Smith and his grandmother.  "Although the ALJ is free to accept or reject testimony of a claimant's parent, a finding that a witness is not credible must be set forth with sufficient specificity to permit intelligible review of the record."  *Hampton ex rel. J.G.P. v. Colvin*, 2015 WL 224414, *5 (W.D.N.Y. 2015) (internal citation and quotation omitted) (citing *Williams ex rel. Williams v. Bowen*, 859 F.2d at 260).  The ALJ summarized the testimony of both Smith and his grandmother in his decision.  (Tr. 15).  Specifically, the ALJ recognized that Smith testified to historical behavioral issues at school, but noted that he testified that he was doing better as a result of his medication regimen, the resources provided at school and the counseling from his mentor.  (*Id.*).  Additionally, the ALJ noted that Smith's grandmother

testified that his medications appeared to help Smith manage his behavior, but that Smith continued to engage in destructive behaviors when angry. (*Id.*). Although the ALJ did not expressly assign a weight to the testimony, I conclude that the ALJ discussed the testimony "in such a way as to make it clear to a reviewer of the decision that [he] credited [the] testimony." *See Hampton ex rel. J.G.P. v. Colvin*, 2015 WL 224414 at *5. The ALJ's determination is not inconsistent with the testimony of Smith or his grandmother. Both individuals testified that Smith had suffered from behavioral issues at school, but that his medication appeared to alleviate his symptoms and that Smith was generally doing better in school. As the ALJ found, "the record clearly demonstrates that [Smith's] behavior improved significantly in 2010 when he re-started taking his prescription medications . . . [and Smith's] poor school performance is more likely than not caused by his very poor attendance." (Tr. 18). On this record, I conclude that "any potential error in failing to assign a specific weight to [Smith's and his grandmother's] testimony is harmless. *See*, *e.g.*, *Hampton ex rel. J.G.P.*, 2015 WL 224414 at *5-6 (citing *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010) ("[w]here application of the correct legal principles to the record could lead only to the same conclusion, there is no need to require agency consideration")); *Curtis ex rel. B.C. v. Colvin*, 2013 WL 3327957 at *6 ("although she did not assign specific weight to [plaintiff's] testimony, the ALJ's evidentiary discussion and functional equivalency analysis are replete with references, both direct and indirect, to her allegations[;] . . . [u]ltimately, the court is able to easily discern the ALJ's reasoning, and her treatment of [plaintiff's] testimony will, therefore, not be disturbed").

## <u>CONCLUSION</u>

The motion for substitution of parties **(Docket # 13)** is **GRANTED**, and the Clerk of the Court is directed to amend the caption accordingly.  After careful review of the entire record, this Court finds that the Commissioner's denial of SSI was based on substantial evidence and was not erroneous as a matter of law.  Accordingly, the ALJ's decision is affirmed.  For the reasons stated above, the Commissioner's motion for judgment on the pleadings **(Docket # 8)** is **GRANTED**.  Smith's motion for judgment on the pleadings **(Docket # 10)** is **DENIED**, and Smith's complaint (Docket # 1) is dismissed with prejudice.

**IT IS SO ORDERED.**

_____
      *s/Marian W. Payson*
      MARIAN W. PAYSON
      United States Magistrate Judge

Dated: Rochester, New York
       March 12, 2015